Jeffrey N. Pomerantz (CA Bar No. 143717)
Debra Grassgreen (CA Bar No. 169978)
Robert M. Saunders (CA Bar No. 226172)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760

[Proposed] Attorneys for Debtor and Debtor in Possession
William M. Lansdale

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>WILLIAM M. LANSDALE<br><br>Debtor | Case No.: 8:09-22982-ES<br><br>Chapter 11<br><br>**DECLARATION OF WILLIAM M. LANSDALE**<br><br>Date: December 15, 2009<br>Time: 10:30 a.m.<br>Place: Courtroom 5A<br>Judge: The Honorable Erithe Smith |

I, William M. Lansdale, declare as follows:

1. I am the debtor and debtor in possession in the captioned case (the "Debtor"). In this capacity, I am generally familiar with my day-to-day business and financial affairs.

2. Except as otherwise stated, all facts contained within this Declaration are based upon personal knowledge (albeit my own or knowledge that is gathered from my review of relevant documents, or my opinion based upon my experience concerning my business and financial affairs). If called upon to testify, I would testify to the facts set forth in this Declaration.

### INTRODUCTION

3. I am ninety years old, and live with my wife, Marianthi, in Seal Beach, California. I care for Marianthi who is quite ill and also take care of my 63 year-old daughter. I have been a businessman in the Southern California community for over 60 years (after returning from World

War II) and pride myself on the relationships I have built over the years, the manner in which I have always conducted myself in my business dealings and my history in dealing with my creditors. As a result, I do not take the decision to file a chapter 11 bankruptcy case lightly. Unfortunately, I find that commencement of a chapter 11 case is necessary to preserve my assets for the benefit of my creditors and my family as a result of an order issued by the United States District Court for the Virgin Islands. As discussed in detail below, the Order was entered in connection with complex litigation pending in the Virgin Islands for the last approximately 17 years. The Order requires me to, among other things, turn over certain monies to a receiver appointed in connection with such litigation. I do not have the liquidity to comply with such order and my efforts to reach a consensual resolution of the litigation have not been successful. Moreover, the issues involved in the litigation are subject to a pending arbitration proceeding. If I am successful in that arbitration, which I believe I will be, it should lead to a favorable resolution of all litigation in the Virgin Islands and result in me being owed several millions of dollars wrongfully held by the receiver in that action. As a result of these circumstances, I have been left with no alternative but to commence a chapter 11 case while I attempt to vindicate my rights and claims in the Virgin Islands litigation. In the days leading up to the filing of my bankruptcy case my professionals and I worked extremely hard to try to settle the issues arising in connection with the Virgin Islands litigation. My professionals worked day and night over this past weekend to document the terms of a settlement which would have resolved all claims arising in connection with such litigation. In fact, Dick Alston of my financial advisor Kibel Green, Inc. flew down to the Virgin Islands to meet with the receiver on November 18, 2009. Although my professionals and I thought that we had reached a settlement, we were not able to consummate that settlement prior to a hearing in the Virgin Islands that took place on Monday, November 23, 2009. During the chapter 11 process I intend to focus on my other business interests which can generate meaningful value to pay my legitimate creditors. In that regard, I have engaged Kibel Green to assist me pre- and postpetition, and to manage and control certain key aspects of my restructuring, all as set forth in my application to employ Kibel Green that I will file with this Court shortly.

## VIRGIN ISLANDS LITIGATION

4. In 1973, I acquired through a limited partnership a parcel in Long Beach, California that was subject to a long term ground lease in my favor. With the help of a financial partner, I developed a shopping center and housing development on this parcel with initially 572 condominiums and boat slips, which became known as "Marina Pacifica." I also acquired another parcel of property which was known simply as Parcel 1B ("Parcel 1B"). It was a valuable property and became, in 1982, the subject of a sale to a developer named Bob Langslet.

5. In the early 1980s, upon the suggestion and advice of both my tax counsel and real estate counsel, I created a new company for the purpose of holding gains realized from the sale of some of my real estate developments. That company was known as La Isla Virgen ("LIV"), a Delaware corporation which was domiciled in the United States Virgin Islands ("USVI"). LIV was considered a "28a Company" which, under existing tax laws, was considered an "inhabitant" of the USVI and, as such, would not be required to pay taxes in the United States but would instead be subject to the tax laws of the USVI. I funded LIV with cash and the sales contract for the sale of Parcel 1B (the "Langslet Transaction"). Upon the closing, the proceeds from the Langslet Transaction became assets of LIV. Additionally, LIV purchased a multistory office building in St. Thomas in the USVI, which was fully occupied and generating positive cash flow.

6. LIV filed USVI tax returns but it did not include the gain from the Langslet Transaction because that income was derived from a foreign source (as to the USVI) and therefore, as my tax advisors told me, was not subject to USVI tax. After the Langslet Transaction was concluded, LIV continued to operate the office building in the USVI until it was later sold.

**A.    Challenge By The Virgin Islands Bureau Of Internal Revenue**

7. Although I had been audited numerous times after that transaction, the U.S. Internal Revenue Service ("IRS") never challenged the tax treatment of the Langslet Transaction. However, the Virgin Islands Bureau of Internal Revenue ("VIBIR") launched a legal challenge to the nonpayment of taxes on the Langslet Transaction, ultimately filing suit in the USVI district court (the "First VIBIR Action"), which initially rendered judgment in favor of LIV. However, the VIBIR

appealed and the USVI district court judgment was reversed by the United States Court of Appeals for the Third Circuit by split decision. The basis of the reversal was that the USVI could treat LIV as if it were a domestic (*i.e.*, USVI) corporation, even though it was formed in Delaware.

8.  As a result of the reversal, in or about 1991, LIV was found liable for approximately $6 million in unpaid taxes. However, because of penalties and interest which accrued during the course of the litigation and appeal, a final tax judgment was entered in the amount of approximately $21 million.

**B.**  Marina Pacific Oil Company / Lonesome Dove

9.  In 1981, I formed a corporation known as "Marina Pacifica Oil Company" ("MPOC"), which engaged in the oil and gas business.

10.  In 1986 my mother died and her estate was probated in Orange County, California. At the conclusion of that process, in 1989, I inherited approximately 435 oil and gas leases and/or mineral interests. Of those, about 385 were then non-producing and about 50 were producing. On my mother's estate tax return, the non-producing wells were valued at a nominal $10 each, while the producing wells were valued at about $1,890,000. Since that date, another approximately 30 interests have commenced production..

11.  MPOC was an "S" corporation, which meant that its losses (as well as its income) would pass through to my personal tax return. Since the corporation generated losses, I was concerned about the basis of the stock because the amount of losses I could take on my individual return was limited. In 1989, on the advice of my accountant, I transferred only the producing wells to MPOC.

12.  In order to consolidate my business operations, in or about 1988, I merged LIV into MPOC. Thereafter, in or about 1992, I merged MPOC and another corporation owned by me known as Lonesome Dove Petroleum Co. ("Lonesome Dove"). The surviving corporation and successor of LIV and MPOC is Lonesome Dove, and it is a Texas corporation.

C.   Lonesome Dove and the Receivership

13.   In 1992, VIBIR sought and obtained appointment of a receiver for Lonesome Dove, for the purpose of collecting and liquidating the assets of Lonesome Dove to pay the tax judgment owed to VIBIR. The district court in the USVI initially appointed Richard Knoepfel as receiver for Lonesome Dove. The receivership order issued by the district court in 1992 ordered the receiver to file a Plan of Liquidation within 60 days, which would provide for liquidation of Lonesome Dove *within one year*.

14.   Mr. Knoepfel investigated assets and made at least two trips to Los Angeles to both interview and depose me, and to investigate Lonesome Dove's assets, and collected a significant amount of documentation. He sold the office building and other assets of the corporation, and turned the funds he collected over to the VIBIR. Mr. Knoepfel also filed suit against my wife and me in our individual capacities, alleging that we possessed assets, including oil and gas properties, that had been assigned to Lonesome Dove (the "Knoepfel Action"). However, after years of investigation and litigation, including a review of Orange County Probate Court records relating to my mother's bequest of oil and gas properties to me, Mr. Knoepfel filed his "Final Report" as receiver with the district court stating that all of the interests assigned by me to MPOC had been duly transferred. In his Final Report, Mr. Knoepfel recommended that the litigation filed against my wife and me be dismissed.

15.   However, the receivership was still not terminated at that time; instead, at the insistence of VIBIR and Ms. Joanne Bozzuto, who had previously been special counsel in the Attorney General's Office for the Virgin Islands assigned to represent VIBIR and was then serving as the Director of VIBIR, Nellon Bowry was appointed as the First Successor Receiver. In 2002, Judith Michaels was appointed as the Second Successor Receiver. The two successor receivers did not locate any additional assets of Lonesome Dove or do anything to wind up the corporation or seek termination of the receivership. They also failed to perform the minimal tasks necessary to properly manage the corporation, including failing to file corporate tax returns and failing to perform corporate formalities necessary to keep Lonesome Dove in good standing in Texas.

16.  In 1997, based upon the recommendation of the first receiver, Mr. Knoepfel, the successor receiver in place at that time (Bowry) settled the Knoepfel Action filed against my wife and me, and filed a Request for Dismissal of that lawsuit. The district court dismissed the case with prejudice. The receivership remained inactive and the court's file was marked closed, although the receivership still had not formally been terminated, for reasons unbeknownst to me.

17.  However, in or about December 1998, VIBIR filed a new lawsuit in the district court of the USVI (the "Second VIBIR Action"), once again naming my wife and me as individual plaintiffs and claiming we were liable for some or all of Lonesome Dove's tax debt due to our alleged failure to transfer oil and gas interests which VIBIR asserted had been assigned by me to Lonesome Dove, although never transferred. These were the very same claims that were made in the Knoepfel Action but which Mr. Knoepfel, as receiver at the time, found to be unsubstantiated after his investigation of the same, and which ultimately were dismissed with prejudice.

18.  Upon legal challenge, the district court in the USVI ruled that while the *receiver* (originally appointed at the behest of and for the benefit of VIBIR) was barred by *res judicata* from asserting any such further claims against my wife and me, due to dismissal of the Knoepfel Action, nevertheless VIBIR, which was not a party to the Knoepfel Action, was not barred from bringing such claims. VIBIR proceeded over the next few years to aggressively prosecute the Second VIBIR Action and conduct discovery of the same facts investigated in the Knoepfel Action. Ultimately in 2002, the parties were ordered by the district court to participate in mediation to try and settle the Second VIBIR Action. During all this time, the receivership case (the First VIBIR Action) remained dormant and inactive but not formally dismissed.

19.  Thus, in or about October 2002, the parties in the Second VIBIR Action participated in mediation before the Honorable George Eltman, a retired judge of the USVI district court. Ms. Bozzuto personally participated in the mediation as VIBIR's "client representative".[1] The parties successfully settled the litigation, executing a document known as the Mediation Agreement, and providing for the prompt execution of a document titled Final Settlement Agreement ("FSA"). The

---

[1] Ms. Bozzuto, who is an attorney, has distinguished her role as "client representative" from that of an attorney as she was appearing in place of the then-Director of VIBIR, effectively as the responsible corporate officer, rather than as counsel for VIBIR, which role was filed by the USVI Attorney General and his staff and outside counsel.

DOCS_LA:209893.18    6

FSA was executed in November 2002 and provided for the dismissal of the Second VIBIR Action with prejudice, once the terms of the FSA were met. A true and correct copy of the FSA is attached hereto as **Exhibit A**.

20. Under the terms of the FSA, VIBIR agreed to seek the prompt termination of the receivership and the return of Lonesome Dove to my wife and me, who would then sell the corporation's remaining "non-liquid assets" (such as its oil and gas interests) and deliver the proceeds to VIBIR. My wife and I personally guaranteed Lonesome Dove's obligation for the payment of $6.5 million in cash to be paid in installments to VIBIR, and gave a lien on our residence to secure that payment. The parties agreed that Ms. Joanne Bozzuto could be appointed as the Final Receiver of the receivership, to serve *without fees,* for the purpose of quickly winding up the receivership. Also under the terms of the FSA, my wife and I provided a declaration of our personal assets and the parties agreed that for a period of ninety days after execution of the settlement, VIBIR could search the world to locate any other assets belonging to my wife or me and if such assets were located, those would be turned over to the VIBIR in addition to all of the sums previously described. Finally, the FSA contained a full release of all claims, known and unknown, and a broad arbitration clause, compelling the parties to resolve any and all future disputes through binding arbitration.

21. Following execution of the FSA, the ninety day period passed during which VIBIR could search for additional assets. Neither VIBIR nor the Final Receiver ever identified any such assets during the ninety day period.

22. Although the FSA required VIBIR to seek the prompt termination of the receivership, it did not do so. The FSA stipulated that the initial cash payment of $2 million must be made within 30 days; however, if the receivership was not terminated by that date, then the payment would be made into an escrow which would be released to the VIBIR upon termination of the receivership. However, as of July 2003, the receivership had not yet been terminated nor the Final Receiver discharged. At that time, in order to secure release of the $2 million from escrow, Ms. Bozzuto promised that if I agreed to a release of the funds, she would ensure that the receivership would be concluded within two or three weeks. VIBIR also promised my counsel and the Court that the final accounting and termination of the receivership would completed by the end of July 2003. Based

upon these promises, and in an effort to be cooperative in reaching finality with respect to all this litigation, I consented to the release of the $2 million from escrow.

23. Almost immediately thereafter, the Final Receiver (Ms. Bozzuto) filed a motion for fees (despite her agreement to serve without fees) and commenced an onslaught of discovery. She took my deposition (the first receiver had already taken it twice); she took my accountant's deposition and demanded documents, all of which had previously been produced to the first receiver (Mr. Knoepfel). Ms. Bozzuto continued to bill Lonesome Dove for her time and that of other outside lawyers hired by her. These fees have now amounted to nearly $2 million since the FSA was signed.

24. In 2004, I made a motion to terminate the receivership. The VIBIR, rather than joining that motion (as it was requested to do) actively opposed the motion, notwithstanding the VIBIR's covenant in the FSA to actively pursue termination of the receivership. The motion was denied.

25. Shortly thereafter, my counsel moved to compel arbitration pursuant to the arbitration clause in the FSA. The VIBIR objected to that motion and the magistrate reviewing the motion, denied it. Nine months later, a USVI district judge reversed the magistrate's order and ordered the parties to proceed with the arbitration.

26. The arbitration was commenced and, in 2006, an Interim Award was issued, deciding two of the three issues presented for arbitration. Specifically, the arbitrator held that (a) VIBIR breached its obligation to seek an end of the receivership, and (b) funds the Final Receiver had collected from the Lansdales or Lonesome Dove to date, net of costs and fees, were properly credited towards the $6.5 million cash component of the FSA. The remaining issue not decided in the initial arbitration proceeding was which oil and gas properties were the corporation's "non-liquid assets" (*i.e.*, whether, as I have always contended, only certain producing assets of those I inherited from my mother were originally assigned to the corporation).

27. In August 2006, VIBIR and I agreed to a mediation instead of the scheduled final arbitration hearing. The Final Receiver, Bozzuto, was invited to participate as well. When that mediation failed, instead of resuming the arbitration as agreed, VIBIR groundlessly attacked Judge

Eltman's impartiality and sought his removal, with the assistance of Ms. Bozzuto. In disgust, Judge Eltman resigned and a new arbitrator had to be selected.

28. I sought confirmation of the arbitrator's Interim Award, which VIBIR opposed. The district court neither confirmed nor set aside the Interim Award, but meanwhile, upon motion of the receiver, ordered me to pay over to VIBIR $1.73 million in royalties collected from the oil and gas assets which had been assigned to the corporation. These royalties were paid to me only after the successor receivers had failed to cash checks that I forwarded to them, and had failed to notify the oil production companies of the proper address where royalties should be sent.[2] I thereafter caused an appeal to be filed to the Third Circuit (the "First Appeal"), seeking confirmation of the arbitrator's interim award, and to set aside the court's order requiring turnover of the $1.73 million in royalties.

29. In January 2009, the Third Circuit issued its ruling on the First Appeal, dismissing the appeal on jurisdictional grounds as being premature (primarily due to the non-finality of the orders being appealed). However the Third Circuit wrote a detailed opinion directed to the parties in which it advised that the arbitration should be allowed to proceed to determine the third issue remaining, *i.e.*, which, if any, of the non-liquid assets inherited by me had been assigned to Lonesome Dove's predecessor and therefore should be transferred to Lonesome Dove.

30. In response to the Third Circuit's decision, the district court initially stayed further court proceedings regarding ownership of the oil and gas assets pending arbitration. Arbitration proceedings resumed.

31. Notwithstanding the pending arbitration proceedings, on Ms. Bozzuto's motion for reconsideration, the district court reversed its prior rulings, asserting that there was no scheduled arbitration proceeding pending, despite being provided with the current arbitration scheduling order. It further reversed earlier holdings that *res judicata* barred assertion of further claims by the receiver against me personally, and scheduled a hearing on the receiver's motion seeking turnover of the

---

[2] During the course of the second VIBIR Action I learned that the receivership had failed to deposit numerous checks, had failed to retitle the properties it did own, and what cash it did control was left in accounts which bore no interest.

DOCS_LA:209893.18                    9

remaining oil and gas interests held by me which had not been transferred to Lonesome Dove, as well as all of the royalties I had received on those properties over the past 17 years.

32. One week before the scheduled arbitration hearing to determine the ownership of the remaining oil and gas interests and the disposition of the same, the district court granted the receiver's motion demanding turnover of the oil and gas interests in dispute, and issued an order (the "Turnover Order") requiring my wife and me to, among other things: (a) immediately transfer the oil and gas interests in dispute to Ms. Bozzuto, as receiver; (b) provide a full accounting of all royalties paid on such interests since 1992 (an amount estimated at approximately $9.5 - $10.5 million (gross), before deductions for taxes, fees, and expenses paid); and (c) pay to the Final Receiver all such royalties collected by me on such interests since 1992.

33. A Notice of Appeal was immediately filed on my behalf (the "Second Appeal"), seeking to set aside the Turnover Order. In addition, due to my concern over the futility of proceeding before the district court, an emergency motion for stay was filed with the Third Circuit, seeking to stay imposition of the Turnover Order until the Appeal on the receiver's motion could be heard. The Third Circuit denied the stay without comment.

34. Meanwhile, arbitration proceedings commenced and were concluded, as scheduled, in October of this year. The parties await issuance of the arbitrator's final decision regarding ownership of the oil and gas interests at issue. The arbitrator has promised a decision and award would be issued in January 2010, following the submission of post-arbitration briefs by the parties.

35. Despite the pending conclusion of the arbitration proceedings, and imminent issuance of a final arbitration award which would resolve the issue of ownership of the oil and gas leases, the Final Receiver has pursued enforcement of the Turnover Order by, among other things, forwarding assignments of these leases to my counsel and demanding that they be executed. My personal attorney forwarded such assignments to my "landman" (the person who handles technical oil and gas issues for me, including assignment and transfers of interests). My landman reported that the proposed assignments were defective; and my counsel so informed the local attorney handling the assignments for the Final Receiver. However, rather than attempting to cure the defects, the Final Receiver (Ms. Bozzuto) instead sought an order to show cause from the district court as to why I and

all of my lawyers (including my personal attorney) should not be held in contempt for failing to execute the defective assignments and otherwise comply with the Turnover Order. The hearing on Ms. Bozzuto's motion is currently scheduled for November 23, 2009. If I am found in contempt by the district court and required to turn over all of the oil and gas interests in dispute, the pending arbitration award, as well as the Second Appeal, may be rendered moot.

36. The Second Appeal remains pending before the Third Circuit. The receivership of Lonesome Dove remains in place, more than 17 years after its initial establishment and despite all of the efforts of my wife and me to settle and terminate these disputes, and notwithstanding the original receivership order which contemplated that the receivership would be terminated within one year. The Final Receiver, Ms. Bozzuto, continues to charge Lonesome Dove for her legal services and that of her outside attorneys, which fees to date exceed $1,750,000. As of this month, the receivers have collected over $11 million in cash from Lonesome Dove, my wife, and me, much of which has been turned over to the VIBIR, more than $4 million in excess of the cash amount owed under the FSA.

37. In the days prior to filing my chapter 11 petition, I attempted (one more time) to settle with VIBIR and its receiver Ms. Bozzuto and, although we had what I thought were productive substantive discussions, we were unable to settle before I determined I had to file my commencing this chapter 11 case.

**ASSIGNMENT FEE ASSET**

38. As I stated above (and as more fully discussed below), staring in 1973, I developed a shopping center and housing development on a parcel with initially 572 condominiums, which became known as "Marina Pacifica." The condominium development generates a very valuable stream of income from what are known as "Assignment Fees" which are paid, or supposed to be paid, by condominium unit owners. These fees belong to an entity known as Southern California Financial Corporation's ("SCFC') of which I am president and 100% shareholder. I assigned my rights to those fees to SCFC on February 5, 2008. SCFC has no creditors and its only asset is its interest in the Assignment Fees. The Assignment Fees are currently the subject of litigation, a favorable outcome of which would, in my opinion, represent an asset worth millions of dollars.

Although the procedural details and antecedents of the pending litigation are somewhat convoluted, the essential issues are straightforward.

39.   In 1973, a limited partnership in which I held an interest, known as Marina Pacifica Limited Partnership ("MPLP"), acquired certain undeveloped real property in Long Beach, California. As a financing device for development and building of the condominium units, MPLP entered into a 68 year ground lease ("Ground Lease") with the original owner. The recorded Declaration of Restrictions, among other things, created a homeowners' association known as "Marina Pacifica Homeowners Association" ("MPHOA").

40.   The Ground Lease provided, among other things, for payment of certain "Assignment Fees" to MPLP by any assignee of MPLP's rights under the Ground Lease, including individual condominium owners. The duty to pay Assignment Fees was separate and independent from the other lease provisions and was binding on successive owners of units in the project.

41.   The Assignment Fee was initially a fixed base amount subject to a cost of living adjustment. That base fee was subject to recalculation in 2006 (and will be again in 2021) based upon the fair market value ("FMV") of the property in those years. FMV was to be established by a "properly qualified and experience real estate appraiser," with any disputes to be resolved by arbitration.

42.   After construction of the condominium units, MPLP dissolved and distributed 43.75% of its interest in the Assignment Fees to me and the balance to two other individuals connected with that partnership. In 1999, the MPHOA acquired the title interest of the original owner of the property on which the condominiums were located, thereby becoming the lessor under the Ground Lease. Thereafter, MPHOA sold its interest in the property to the individual condominium owners. In 2000, the MPHOA acquired the Assignment Fee interests from all holders except me. At no time (until the 2009 litigation described below) were the Assignment Fee provisions of the Ground Lease renegotiated or challenged as invalid.

43.   In August 2005, having been unable to agree with the MPHOA on the recalculated FMV, I commenced an action for declaratory relief against the MPHOA, which acted on behalf of its member condominium owners, in the Superior Court of the State of California, County of Los

DOCS_LA:209893.18                    12

Angeles ("Original Lansdale Action"). Although there were a number of procedural and substantive disputes in that litigation, in summary, it fell into two stages: (a) the appointment of an appraiser to determine FMV and (b) arbitration of the amount of the FMV and subsequent court confirmation of the award.

44. In the course of the proceedings in the Original Lansdale Action related to appointment of an appraiser, the parties agreed, the Superior Court determined and the Court of Appeal affirmed that: (A) the Assignment Fee was valid; (B) I was entitled to 43.75% of the amount of those fees; (C) the fees were to be based upon the FMV as determined by an appraiser who should be appointed pursuant to a California statute.

45. As stated above, on February 5, 2008, I assigned all of my interest in the Assignment Fee to SCFC. On June 2, 2008, pursuant to stipulation of the parties and order of the court, SCFC was substituted into the action as the real party in interest.

46. Subsequently, on October 30,. 2008, the appointed appraiser issued a report finding the FMV of the property to be $60,615,500.00 for purposes of calculating the Assignment Fee ("Arbitration Award"). That award was confirmed by order of the Superior Court pursuant to an unopposed motion on December 16, 2008.

47. Since the Arbitration Award, the vast majority of condominium unit owners have either paid no Assignment Fees or else paid only the original fixed fees.

48. There are currently three lawsuits pending in the Superior Court for Los Angeles County relating to the Assignment Fees, which were brought subsequent to the Original Lansdale Action: (a) a lawsuit brought by the MPHOA (the "New MPHOA Action") seeking to have the Assignment Fee declared invalid more than 35 years after the inception of the Ground Lease; (b) a lawsuit brought by SCFC (the "New SCFC Action") seeking to recover the Assignment Fees from the individual unit owners based on the Arbitration Award; and (c) a lawsuit (the "Bello Action") was filed by Stephen Bello, a single homeowner and former president of the MPHOA, relating to his Assignment Fee liability only.

49. SCFC's and my attorneys have demurred to the MPHOA complaint on the following grounds (among others): (a) that MPHOA lacks standing since the Assignment Fee is, per the

Ground Lease's express language, an individual obligation; (b) that the complaint is barred by *res judicata*, since the Original Lansdale Action has already determined that the Fee is valid through 2041; and (c) of the separate *res judicata* effect of the Arbitration Award which determined the FMV of the Property. That demurrer has been denied. In the Bello Action, opposing counsel has promised to file a Third Amended Complaint, which he has said would plead only one declaratory relief cause of action based on how the fee is to be calculated, since he agrees the Assignment Fee was determined to be valid in the Original Lansdale Action.

50. The damages potentially recoverable in the New SCFC Action are very substantial. Those damages would include: (a) past due Assignment Fees owed by the unit owners; (b) future monthly Assignment Fees owed by the unit owners through 2041, subject to readjustment in 2021 based on FMV at that time; (c) tortious interference claims against MPHOA; and (d) attorneys' fees and costs.

51. SCFC is represented in all three actions by Best Best & Krieger, LLP, which also represents me personally in the New MPHOA Action. Although he has not formally appeared as counsel in these actions, Peter Gelles, Esq. is also representing both SCFC and me regarding them. I have been personally funding the costs of this litigation by advances to SCFC. Prior to the petition date, I advanced to SCFC $130,000 to provide retainers to each of the counsel. In my monthly budget (see Budget Motion below), I have included $20,000 per month that I expect to fund to SCFC to pay its counsel in the pending litigation. I believe that the New SCFC Action to represents a very valuable asset and I intend to fund payment to my creditors from proceeds thereof.

## BOAT SLIP SALE

52. The Marina Pacifica marina has approximately 6,100 lineal feet of boat slips for rent to the public. I had bought the interest of the ex-wife of my partners in the boat slips in 1978 and gave her an unsecured promissory note in the face amount of $467,000 to be paid over time.

53. About four or five years ago, I hired Admiralty Marine Surveyors to survey the entire project and report on its condition. The essence of the report was that the boat slips had a useful life of about 40 years and had been operating for 33. Consequently, the slips were coming to the end of their useful life.

54. After I received the report, I began seeking a buyer. A buyer agreed in writing to buy the boat slips for my asking price of $6.5 million, subject to due diligence. The buyer that signed the agreement, however, assigned its rights under the sale agreement to another buyer. That buyer performed its due diligence and, in July 2005, based on its income and repair/upkeep analysis offered to buy the boat slips (plus an interest in the Assignment Fees) for $3 million. I declined the offer because I believed the boat slips were worth more than that offer.

55. In June 2009, another buyer presented me with an offer to buy the boat slips for $3,520,000. After negotiations, I was able to increase the purchase price to $5 million. In July 2009, that buyer agreed to pay me $4 million cash upon closing plus $1 million in a note, payable in five years, without interest, for the boat slips. The sale closed this month.

56. I deposited the sale proceeds into one of my bank accounts. Some of the proceeds were used by me to make payments to my ordinary course creditors as well as to pay professionals' retainers and for certain ordinary course family support payments, as discussed below. Also, the sale is subject to what may be substantial Federal and State of California taxes, which are not yet due and were not paid prior to my bankruptcy filing.

## FAMILY SUPPORT

57. I have for years supported my 63-year old daughter Linda Lansdale. I plan to continue to support my daughter, as discussed in the Budget Motion section below. I pay the monthly deed of trust payment for my condominium unit in which my daughter resides. I also pay for her medical insurance, as well as provide her with approximately $2,500 each month for living expenses.

58. Prior to my filing, I also supported Karen Kozaites and three of her four children, who are my wife's grandchildren (I recently paid approximately $4,400 for a semester's college tuition for one of them). Ms. Kozaites owns 95% of the equity in her own house (I own the other 5%), subject to a first deed of trust and encumbrances asserted by Ms. Kozaites's ex-husband, who is my wife's son. This month, I loaned Ms Kozaites $200,000 in exchange for a junior deed of trust on her house, which I believe is supported by the value of the house, so that she can support herself and her children during my bankruptcy case.

## BUDGET MOTION

59. In order to minimize the adverse effects of the commencement of my chapter 11 case and because I need immediate certainty as to my ability to utilize my income to meet my family's and my day to day living expenses as detailed above and to pay the expenses related to my business enterprises, including employee wages, I have requested approval of my budget (the "Budget") pursuant to the *Motion for Order Authorizing the Use of Estate Funds Pursuant to a Budget and Waiving Rule 6004(h)* (the "Budget Motion") that was filed simultaneously with this Declaration. A true and correct copy of the Budget is attached as Exhibit A to the Budget Motion. Uninterrupted use of funds to pay my family's and my living expenses is essential to our well being. Further, the payment of the expenses related to my mineral and real estate holdings, including employee wages, is necessary to maintain the value of the assets for the benefit of my legitimate creditors and my family. The bankruptcy estate will benefit by the resolution of the Budget Motion because after I have certainty as to my ability to provide for my family and preserve my assets, I will then be able to focus my efforts on resolving this chapter 11 case.

60. My monthly expenses fall into three general categories: (a) personal living expenses; (b) business expenses; and (c) support for family and dependents. My personal living expenses are set forth in the portion of the Budget identified as Budget A-1 attached to the Budget Motion. These expenses are modest and self-explanatory – they include items such as food and lodging, medical expenses, and utilities. The business expenses related to the maintenance and operation of my mineral and real estate holdings business expenses are set forth in the portion of the Budget identified as Budget A-2 attached to the Budget Motion and relate to the operation of oil wells that generate significant income and are valuable estate assets as well as my valuable real estate holdings including the Assignment Fee litigation which is described in detail above. Finally, in addition to expenses necessary for my support and the support of my wife –Marianthi – who is ill, I support my 63-year old daughter, Linda. The modest expenses related to my support of Linda are set forth in the portion of the Budget identified as Budget A-3 attached to the Budget Motion. I have reviewed the Budget, which was prepared by my financial advisor Kibel Green at my direction.

61. The expenses set forth in the Budget are consistent with my historical personal and business expenses. Accordingly, in my judgment, the expenses set forth in the Budget are ordinary course expenses. Further, I do not believe that my expenses and lifestyle are extravagant. In my judgment, the expenses set forth in the Budget are reasonable and appropriate.

## CONCLUSION

62. I reluctantly filed for bankruptcy protection to preserve my assets so that I can pay my legitimate creditors and continue to provide for my family. I believe that I am owed a substantial amount of money from the escrow held by the Virgin Island's receiver and that when I prevail on in the Assignment fee litigation I will have sufficient funds (over time) to pay my undisputed creditors in full. My intent is to file a chapter 11 plan that will provide my worthy creditors with their payments (over time if necessary) so that I can keep my promises to them, as I have done throughout my life. I have hired experienced advisors to assist me in this regard and have vested Kibel Green with duties and responsibilities that will assure that my chapter 11 estate is managed in a manner that will maximize value to creditors and other parties in interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 23 day of November, 2009 at SEAL BEACH, California

_William M. Lansdale_